UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JONNARD NELSON #260733,

        Plaintiff,

    v.

SUSAN H. WILSON, et al.,

        Defendants.

_____/

Case No.  2:19-cv-00009

Hon.  Paul L. Maloney
U.S. District Judge

## REPORT AND RECOMMENDATION

### I. Introduction

This Report and Recommendation (R&R) addresses summary judgment motions filed by Nurse Practitioner (NP) Wilson and Registered Nurse (RN) Covert. (ECF Nos. 68 and 70.)  NP Wilson and RN Covert are the remaining Defendants in this case.  (ECF No. 52.)

State prisoner Jonnard Nelson filed this civil rights action pursuant to 42 U.S.C. § 1983 on January 10, 2019.   He alleges that his rights were violated while he was confined at the Chippewa Correctional Facility (URF).   (ECF No. 1.) Nelson's verified complaint alleged that after he had abdominal surgery to remove a blockage in his intestine, Defendants were deliberately indifferent to his medical needs, in violation of his Eighth Amendment rights, and that Defendant Covert retaliated against him, in violation of his First Amendment rights.

Specifically, Nelson alleges that NP Wilson refused to renew a bottom bunk detail on April 17, 2018, which required him to use a bunkbed that was higher off the floor while he was in a weakened condition.  Nelson alleges that RN Covert retaliated against him on June 5, 2018, by removing his crutches and ice accommodation after he filed a grievance against NP Wilson and other health care staff.

The medical record shows that Nelson received extensive and appropriate post-operative care at the prison by NP Wilson and other nursing staff.  Nelson returned to the prison after undergoing abdominal surgery on December 23, 2017.  NP Wilson provided Nelson with medical orders for a bottom bunk through February 28, 2018.  NP Wilson did not transfer Nelson to a new unit or assign him to a bottom bunk.  Nelson says he had an incisional hernia and subsequently injured his ankle because he did not have a bottom bunk detail.  However, the medical evidence does not support Nelson's claim.  The evidence before the Court fails to establish a genuine issue of material fact with respect to Nelson's claim that NP Wilson acted with deliberate indifference to his medical needs.

In addition, the medical records show that the only time that RN Covert examined Nelson was on June 12, 2018 – some twelve days after he sprained his ankle and after x-rays revealed no fracture to his foot or ankle.  RN Covert informed Nelson that he needed to walk on his foot to accelerate the healing process and ended Nelson's crutch detail.  Nelson blames Covert for the removal of his ice detail on June 5, 2018.  It is unclear when the ice detail ended, but RN Covert states he

was not involved in ending the ice detail.  As a result, the undersigned concludes that the evidence before the Court fails to establish a genuine issue of material fact with respect to Nelson's deliberate indifference claim against RN Covert in June of 2018.  Further, the undersigned concludes that the evidence before the Court fails to establish a genuine issue of material fact with respect to Nelson's retaliation claim against RN Covert because RN Covert would have taken the alleged adverse action – ending Nelson's crutch detail – regardless of his protected activity.

It is respectfully recommended that the Court grant Defendants' motions for summary judgment and dismiss this case.

## II.  Factual Allegations

Nelson alleges that his First and Eighth Amendment rights were violated while he was incarcerated at URF from December of 2017 to June of 2018.  In December of 2017, Nelson was taken to the hospital due to stomach pain.  (ECF No. 1.)  Abdominal surgery was performed to remove a blockage – described as a "balloon of drugs" – that Nelson allegedly swallowed.  (*Id.*, PageID.2.)  Nelson denies that he swallowed drugs.  Surgeons removed from Nelson's abdomen a finger of a rubber glove stuffed with paper.  (*Id.*)

On December 23, 2017, Nelson was released from the hospital with instructions to avoid strenuous activities and lifting over 10 pounds.  (*Id.*, PageID.3.)  Nelson says that the doctor told him to take short walks and to splint his abdomen while getting up and down. (*Id.*)  Nelson also says that the doctor

wanted to give him something strong for pain but was afraid that the prison would not give a strong medication.  (*Id.*)

Once he returned to the prison, Nelson was examined by a nurse who gave him Tylenol and assigned him to a top bunk.  (*Id.*, PageID.4.)  After Nelson protested, the nurse was able to assign him to a bottom bunk.  (*Id.*)  Nelson was told that he would be called out twice per day for bandage changes and check-ups.  (*Id.*)

Nelson says that, on December 26, 2017, he was given orders to receive his meals on trays until December 28, 2017, and for a bottom bunk until February 28, 2018.  (*Id.*)  Nelson was not to lift over ten pounds until February 6, 2018.  (*Id.*)

Nelson says that he began experiencing excruciating pain and bleeding from his surgical wound on January 2, 2018.  (*Id.*, PageID.5.)  Health care employees rebandaged his wound.  (*Id.*)  The wound became infected on January 14, 2018, and Nelson received a stronger antibiotic to treat the infection.  (*Id.*)

During March 2018, Nelson was moved to a new unit on the west side of the prison and assigned to a top bunk.  (*Id.*)  Nelson says that this required him to jump between four and six feet to his bunk while he balanced on a flimsy plastic stool. (*Id.*)  Nelson says he was only able to use one arm because he needed the other arm to splint his stomach while he moved.  On March 7, 2018, Nelson says that he discovered a growth on his stomach that he believed was caused by jumping to and from his bunk.  (*Id.*)

On April 17, 2018, NP Wilson told Nelson that he was suffering from an incisional hernia, which was "perfectly normal."  (*Id.*)  Nelson explained that he was

in severe pain from jumping onto and off his bunk and requested a bottom bunk detail. (*Id.*, PageID.6.) NP Wilson allegedly told Nelson that he would be okay. (*Id.*) Nelson protested, stating that he was not supposed to engage in any strenuous activity, but NP Wilson merely repeated that Nelson would be okay. (*Id.*) NP Wilson issued a hernia binder for Nelson and ended the visit. (*Id.*)

Nelson continued using the top bunk until June 1, 2018, when he fell while trying to get down from his bunk using one hand. (*Id.*) As a result of the fall, Nelson says his abdominal wound reopened, and he suffered an injury to his left ankle. (*Id.*) Nelson then received crutches, ice, an extra pillow to elevate his leg, a fiberglass splint and two ace wraps, and a bottom bunk detail. (*Id.*)

On June 5, 2018, Nelson wrote a grievance on Defendants NP Wilson, RN Covert, and other health care staff. (*Id.*, PageID.7.) Nelson says that RN Covert took away his ice detail on the same day, although a nurse reported that Nelson's foot was still swollen. (*Id.*, PageID.14.) Nelson says his ankle injury was confirmed by an x-ray taken on June 6, 2018.

Nelson says that, on June 12, 2018, RN Covert reviewed the grievance with him.[1] (*Id.*, PageID.7.) Nelson protested that since RN Covert was named in the grievance, someone else should conduct the grievance review. (*Id.*) According to Nelson, RN Covert stated that he was just there to make things go away, and that if Nelson wanted a permanent bottom bunk detail, he merely needed to sign off on the

---

[1] Nelson attached a copy of his Step I grievance to his response brief. (ECF No. 77.) The grievance shows that it was reviewed by Officer LaPlaunt. (ECF No. 77-9, PageID.926-927.)

grievance. (*Id.*) RN Covert added that if Nelson did not sign off on the grievance, things would not end well for him. RN Covert then stated: "you have a hernia right. How did it happen, because you swallowed some drugs right?" (ECF No. 1, PageID.14.) Nelson denied this assertion and RN Covert responded, "that's not what I heard. You're responsible for everything that's going on with you, it's your fault." (*Id.*) Nelson did not sign off on the grievance and he filed a second grievance against RN Covert.

RN Covert then allegedly changed the stop date for Nelson's special medical details from June 30, 2018, to June 19, 2018, without any explanation. (*Id.*) Nelson asserts that this was done in retaliation for Nelson's grievances. (*Id.*) RN Covert took Nelson's ace wraps, splint, and crutches and told him to return to his unit. (*Id.*) Nelson says he was unable to put any pressure on his foot, so RN Covert told him to use the crutches to walk back to his unit and get some better shoes. (*Id.*) RN Covert ordered Nelson to bring the crutches right back. (*Id.*) After returning the crutches to health care, Nelson says that he was forced to limp back to his unit in excruciating pain. (ECF No. 1, PageID.15.)

### III. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## IV.  Eighth Amendment

Nelson argues that Defendant Wilson violated his Eighth Amendment rights by not extending his bottom bunk detail after his surgical wound became infected. Nelson argues that upon discharge from the hospital he received instructions for 6 weeks of recovery time which should have been extended to 10 weeks due to his infection.  Nelson argues that the time he was recovering from an infection should have been excluded from his 6-week recovery time and his bottom bunk detail should have been extended at least 4 more weeks.  (ECF No. 79, PageID.934.)  The actual discharge instructions are set forth below:

DISCHARGE INSTRUCTIONS
No heavy lifting, pushing, or pulling for six weeks.  He should follow up at health services for a wound check in one week.  He should continue on his Zantac 150 b.i.d. that he was taking on admission.

FINAL DISCHARGE DIAGNOSIS
Small bowel obstruction secondary to foreign body ingestion.

PROCEDURES DURING THIS ADMISSION
Exploratory laparotomy and small bowel enterotomy with removal of foreign body.

(ECF No. 71-1, PageID.814.)  Further, Nelson asserts that by not extending his bottom bunk detail, NP Wilson knowingly subjected him to unnecessary risk of

injury.  (*Id.*)  Nelson argues the treatment that was provided was not appropriate because he experienced pain and discomfort, developed a hernia, and injured his ankle.  (*Id.*)

Nelson further asserts that RN Covert acted with deliberate indifference to his ankle injury by taking away his ice and his crutches before he fully recovered.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as the failure to provide such care would be inconsistent with contemporary standards of decency.  *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*  "[A]n inmate who complains that ***delay in medical treatment*** rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."  *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted).

The Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's ***failure to treat a condition adequately***, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added).  Thus, *Napier* and *Blackmore* provide a framework for assessing a claim of delayed or inadequate care for a non-obvious condition:   A plaintiff making this type of claim must place verifying medical evidence in the record to show the detrimental effect of the delayed or inadequate treatment.

However, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore*, 390 F.3d at 899.

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care."  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*  Under *Farmer*, "the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). The court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.
>
> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.
>
> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

10

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in

state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell* 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

### 1. Medical Records

On December 19, 2017, Nelson complained of abdominal pain and vomiting. (ECF No. 68-2, PageID.562-566.) NP Wilson ordered staff to take Nelson to the War Memorial Hospital Emergency Department. (*Id.*, PageID.567-569.) At the hospital, Nelson admitted that he swallowed a finger of a rubber glove stuffed with paper. (*Id.*, PageId.571.) Nelson underwent abdominal surgery to remove the object from his bowel. (*Id.*, PageID.577.) Nelson was discharged with instructions of "no heavy lifting, pushing, or pulling for six weeks" and to use Tylenol for pain. (*Id.*, PageID.577, 578.)

Upon his return to the prison on December 23, 2017, RN MacDowell issued Nelson temporary details with orders for no lifting, pushing, or pulling over 10lbs, and provided him with 12 packets of Tylenol. (*Id.*, PageID.583.) The next day, RN MacDowell cleaned Nelson's wound, scheduled him for daily nursing checks, and provided him with instructions. (*Id.*, PageID.584.)

On December 26, 2017, NP Wilson examined Nelson for the first time since he had returned from the hospital. (*Id.*, PageID.588-589.) NP Wilson noted that nursing staff had re-dressed Nelson's wound and she ordered a bottom bunk detail, two days of meals in his cell, and continued nursing daily dressing changes for 2 weeks. (*Id.*)

On December 27, 2017, Nelson did not come to health care for his dressing change. (*Id.*, PageID.592.) RN Headley changed Nelson's dressing the next day and she stressed the importance of getting the dressing changed each day. (*Id.*, PageID.593.) On December 29, 2017, Nelson's wound continued to drain, and RN Guild noted no redness or swelling. (*Id.*, PageID.594.) Over the next few days, Nelson's wound was healing better with less drainage. (*Id.*, PageID.595-597.)

On January 5, 2018, RN Headley noted that Nelson had a small 1mm open circular area at the bottom of the old incision and upon palpation thick fluid was expressed. (*Id.*, PageID.598.) RN Headley took a wound culture. (*Id.*) NP Wilson was consulted due to the possibility of infection, and she prescribed the antibiotic Cleocin for 10 days. (*Id.*, PageID.599-600.) The wound was infected, and Nelson

was seen daily by nursing staff for dressing changes between January 6 and January 15, 2018.  (*Id.*, PageID.601-610.)

On January 16, 2018, NP Wilson performed a chart update and noted that the wound culture found MRSA, which was addressed by the antibiotic Cleocin, but because two other organisms were growing, she ordered the antibiotic Cipro.  (*Id.*, PageID.611.)  NP Wilson also examined Nelson and noted: "wound almost totally healed no redness or drainage."  (*Id.*, PageID.613.)

On January 18, 2018, there was no drainage at the wound.  (*Id.*, PageID.615.) On January 22, 2020, Nelson reported to a nurse that he had removed the dressing the day before.  (*Id.*, PageID.616.)  On exam, there was no drainage or open area, and no bandage was needed.  (*Id.*)

It appears that Nelson did not seek medical care between January 22 and April 4, 2018, because the record contains no medical records for that time period.

On April 4, 2018, Nelson was examined by RN Guild after he complained of a bulge in his stomach area.  (*Id.*, PageID.620.)  Nelson believes that this was caused because he had to climb to an upper bunk.  (*Id.*)  RN Guild noted a "10cm bulge rt of midline incision in rt upper quadrant" and suspected an incisional hernia.  (*Id.*)  On April 17, 2018, Nelson was examined by NP Wilson.  (*Id.*, PageID.621.)  NP Wilson provided Nelson with a hernia binder and pain relief medication.  (*Id.*, PageID.621-622.)

On June 1, 2018, NP Wilson was consulted regarding Nelson's fall from his top bunk and injury to his left foot.  (*Id.*, PageID.624.)  A portion of Wilson's report is shown below.

> States he was coming down from top bunk, was holding onto his abd binder to protect his hernia, and slid down to the stool which tipped over, landed on lateral side of left foot, twisted outwards

(*Id.*, PageID.626.)  RN Bennett applied a fiberglass splint and provided crutches and a bottom bunk, and gave instructions to consult with the NP.  (*Id.*, PageID.624.) On June 5, 2018, NP Wilson was consulted and his chart was updated.  (*Id.*, PageID.629.)  NP Wilson extended "details to the end of the month and give motrin from stock."  (*Id.*)  X-rays revealed a normal left foot with swelling in the ankle:

IMPRESSION:

Normal left foot.


TYPE OF EXAM:  LEFT ANKLE, FOUR VIEWS

FINDINGS:  Soft tissue swelling of the left ankle is present.  There are no acute displaced fractures or any other acute osseous abnormalities present.  The ankle joint articulating surface was unremarkable.

IMPRESSION:

Soft tissue swelling of the left ankle.


(*Id.*, PageID.631.)

On June 12, 2018, RN Covert reviewed the x-ray with Nelson and had him return his crutches.  (*Id.*, PageID.634.)

**Subjective:**
Pt states its still a little tender.

**Objective:**
Pt here for review of x ray and return of equipment. L foot pt able to bear weight. Mild edema and discomfort with movement.. No deformity. X ray results negative and findings reviewed with patient.

**Assessment:**
alt in comfort r/t ankle sprain.

**Plan:**
Pt returned cruthes given ace wrap for comfort or L ankle sprain . RTC in one week for return equip. Pt agrees with plan

(*Id.*, PageID.634.)

Nelson was examined on June 19, 2018, by RN Headley who noted:

**Objective:**
Pt had exagerated limp into healthcare clinic. Bilateral shoes and socks removed. No diferrence betweeen left and right ankle/foot. Ace wrap returned. Advised pt he may return to normal activity. Pt visualized outside healthcare with no limp ambulating with brisk steady even gait.

(*Id.*, PageID.635.)

### 2. NP Wilson

NP Wilson argues that she provided appropriate medical care for Nelson and was not deliberately indifferent to his medical needs. Nelson concedes that he received treatment from NP Wilson and other nurses but argues that NP Wilson failed to provide the proper treatment for his medical condition. Nelson agrees that NP Wilson gave him an accommodation for a bottom bunk until February 28, 2018. However, Nelson was assigned a top bunk in March of 2018, after he transferred to a different prison unit. Nelson argues that NP Wilson should have interceded and assigned him to a bottom bunk due to his medical condition.

NP Wilson states that she has authority to order a bottom bunk detail where it is medically justified by the circumstances. (ECF No. 68-5.)   NP Wilson provided a medical detail for a bottom bunk while Nelson was recovering from abdominal surgery.   Once Nelson recovered from abdominal surgery, NP Wilson could no longer justify extending the bottom bunk detail past the February 28, 2018, expiration date.   (ECF No. 68-5, PageId.708.)   The medical records show that Nelson recovered by the end of January and did not have further issues until he was diagnosed with an incisional hernia in April of 2018.

MDOC Medical Service Advisory Committee Guidelines authorize NP Wilson to order a bottom bunk detail for prisoners recovering from abdominal surgery.[2] (ECF No. 68-4.)  Contrary to Nelson's argument, NP Wilson did not have authority to order a bottom bunk detail for all medical conditions.  Under the guidelines, NP Wilson could not order a bottom bunk detail for a prisoner with a hernia without first establishing a medical justification and obtaining approval from the Assistant Chief Medical Officer.  (*Id.*; ECF No. 68-5, PageID.708.)

The medical records establish that NP Wilson provided appropriate post-operative care for Nelson, including a bottom bunk detail.  MDOC nurses provided Nelson with daily wound care and bandage replacement and Nelson received pain medication during his recovery.  At the time the bottom bunk detail expired, NP Wilson did not have a justification to order a continued bottom bunk detail.  Nelson recovered from the abdominal surgery and his wound had healed by the end of January of 2018.

On March 13, 2018, Nelson says he was transferred to a different unit and assigned to top bunk. (ECF No. 79, PageID.938.)[3]  Nelson states that it was difficult

---

[2]     The guidelines give providers, such as NP Wilson, authority to order a bottom bunk detail if medically necessary for certain conditions or post-operative considerations.  For example, recovery from abdominal surgery is a listed condition, but a hernia is not.  The listed conditions and considerations do not automatically warrant a bottom bunk detail – they allow a provider to order the detail without first seeking approval.  In all other instances, a provider such as NP Wilson, would need to request approval in writing from the Assistant Chief Medical Officer for a bottom bunk detail.

[3]     Nelson says that on March 14, 2018, he wrote kites requesting a bottom bunk to health care, the Warden, and the Deputy Warden, and spoke to PC Thompson who told him she would move him when a bunk became available.

to get into a top bunk because there was no ladder or device to gain safe access. (*Id.*)  Nelson explained that he accessed the top bunk by stepping onto a stool and pulling himself up with only one hand because he needed to splint his stomach with the other hand.  (ECF No. 80-1, PageID.966.)

NP Wilson was not involved in transferring Nelson to a new housing unit or assigning him to a bunk in his new unit.  Even after Nelson was diagnosed with a hernia, there existed no medical justification for NP Wilson to make a request for a bottom bunk detail.  (ECF No. 68-2, PageID.621-622.)  Nelson has failed to present any verifying medical evidence showing that he had a need for a bottom bunk detail due to his hernia.

Nelson argues that he should have been given an extended bottom bunk detail due to the fact that it took him 4 weeks to recover from his infection.  Nelson supports this argument with internet research he conducted in the prison and concludes that four weeks should have been added to his recovery time.  (ECF No. 80-5, PageID.980, 1009-1010.)  Nelson theorizes that he should have been given an accommodation for a bottom bunk for at least 10 weeks to allow him to fully recover, and if he had the bottom bunk detail for 10 weeks, he would not have had an incisional hernia in April of 2018, or an ankle sprain in June of 2018.  Nelson's theory is entirely speculative and not based upon verified medical evidence.  Nelson makes assumptions based solely on internet research that he had conducted.  Even assuming that Nelson's internet research is admissible evidence, it is not specific to Nelson's medical condition and fails to establish that NP Wilson was deliberately

18

indifferent to Nelson's medical needs.  The medical records do not support Nelson's argument that NP Wilson violated his Eighth Amendment rights.

Nelson had recovered from his abdominal surgery by the time his bottom bunk detail expired on February 28, 2018.  (ECF No. 68-5, PageID.707.)   Nelson was diagnosed with an incisional hernia in April of 2018, but that did not necessitate any medical accommodations or a bottom bunk detail.[4]  Unfortunately, in June of 2018, Nelson sprained his ankle while coming down from his top bunk. Nelson cannot attribute his hernia or the fact he injured himself while coming off his top bunk to NP Wilson.  Nelson has failed to place verifying medical evidence into the record that could show that extending his bottom bunk detail past February 28, 2018, was medically necessary due to his condition.  He has also failed to show that NP Wilson caused him unnecessary pain or harm that rose to the level of deliberate indifference.  In the opinion of the undersigned, Nelson has failed to establish that NP Wilson was deliberately indifferent to Nelson's medical condition.

### 3.  RN Covert

RN Covert argues that Nelson's ankle sprain was not a serious medical condition under Eighth Amendment standards.   RN Covert states that he determined crutches were no longer necessary twelve days after a soft tissue injury because to recover fully from the sprain Nelson needed to put some weight on his ankle.  (ECF No. 71-1, PageID.737.)   Nelson disagrees, arguing that his ankle

---

[4]      Nelson says that he told NP Wilson that it was unsafe for him to be assigned to a top bunk when she diagnosed him with an incisional hernia. (ECF No. 79, PageID.940.)

sprain was a serious medical condition, and that RN Covert removed his crutches before he fully healed, causing him unnecessary pain.  Nelson explains that his ankle was still swollen and "could have taken 1-4 weeks to recover."  (ECF No. 77, PageID.897.)

RN Covert argues that Nelson's ankle injury was not objectively serious to satisfy Eighth Amendment standards and that federal courts routinely reject ankle sprains as a serious medical condition. RN Covert cites to *Wirtz v. Buchanan*, No. 2:11-CV-1131, 2013 WL 372462, at *7 (S.D. Ohio Jan. 30, 2013), report and recommendation adopted, No. 2:11-CV-1131, 2013 WL 3155775 (S.D. Ohio June 20, 2013), for the proposition that ankle sprains are not a serious medical condition. The *Wirtz* Court stated:

> Applying this standard to Mr. Wirtz's claim, the Court must first consider whether the ligament laxity in his right ankle mandated treatment or was so obvious that a lay person would perceive the need for immediate medical attention.  Ankle conditions similar to that of Mr. Wirtz, where there is no evidence of fracture or dislocation, have frequently been found by courts not to constitute serious medical conditions. *See Dotson v. Correctional Medical Services,* 584 F.Supp.2d 1063 (W.D.Tenn. 2008) (ankle sprain not serious medical need); *Bacon v. Harder,* 248 Fed.Appx. 759 (7th Cir. 2007) (ankle sprain was not serious medical condition); *Galego v. Scott,* 2011 WL 6752563 (D.Nev. Sept. 8, 2011) (bone spurs and mild arthritic changes in ankle not serious medical condition); *Doumin v. Carey,* 2008 WL 4241075 (N.D.N.Y. September 12, 2008) (twisted ankle not a serious medical need); *Johnson v. Kachelmeyer,* 2006 WL 625837, at *9 (W.D.N.Y. Mar. 9, 2006) (ankle sprain with several contusions not sufficiently serious medical condition); *Chatin v. Artuz,* 1999 WL 587885, at *3 (S.D.N.Y. Aug. 4, 1999) (soft-tissue swelling without ankle dislocation or fracture, and subsequent diagnoses of a bone spur, neuroma and tendinitis, not sufficiently serious to warrant protection under the Eighth Amendment).

*Id.*

20

When Nelson first presented with a foot or ankle injury, NP Wilson was unsure whether he had a sprain or fracture, so she ordered an x-ray and provided crutches. This was an appropriate response to a suspected foot or ankle break. It turned out that Nelson did not fracture his foot or ankle and only suffered a sprain. By the time RN Covert saw Nelson on June 12, 2018, his ankle sprain was likely no longer a serious medical condition. Whether, his ankle sprain presented a serious medical condition on June 1, 2018, is a different issue. RN Covert acknowledges that ankle sprains do require crutches "for a few days to a week." (ECF No. 71-1, PageID.738.) In the opinion of the undersigned, under the facts of this case, a question of fact exists whether Nelson meets the objective standard of showing that his ankle sprain was a serious medical condition under Eighth Amendment standards. RN Covert says that he did not treat Nelson until June 12, 2018. (ECF No. 71-1, PageID.737.) RN Covert says that he did not examine or treat Nelson on June 5, 2018. (ECF No. 71-1, 737.) Nelson says that RN Covert told another nurse to take Nelson's ice detail away on June 5, 2018, while Nelson's ankle was still sprained.[5]

In the opinion of the undersigned, however, Nelson cannot show that RN Covert acted with deliberate indifference. Although Nelson asserts that RN Covert did tell another RN to remove Nelson's ice detail on June 5, 2018, Nelson fails to

---

[5]    Nothing in the medical records show when the ice detail ended. NP Wilson extended all medical details on June 5, 2018, until the end of the month (ECF No. 68-2, PageID.629), x-rays were taken on June 6, 2018, (*Id*., PageID.631), and there was a chart update on June 8, 2018, to indicate that the x-rays were negative for fractures to the foot or ankle. (*Id*., PageID.633).

show that the discontinuation of the ice detail was medically improper or deliberately indifferent.[6]  When RN Covert examined Nelson's ankle on June 12, 2018, he determined that Nelson was able to bear weight and had a mild edema and discomfort with movement.  RN Covert determined that crutches were no longer needed and provided an ACE bandage for comfort.

Nelson failed to place verifying medical evidence into the record that could establish that RN Covert caused him to suffer unnecessarily or caused his ankle to not heal properly.  Nelson's internet research regarding sprained ankles, even if admissible, fails to establish a genuine issue of fact on his Eighth Amendment claim against RN Covert.  The undersigned recommends that the Court dismiss the Eighth Amendment claims.

## V. Retaliation

Nelson argues that RN Covert retaliated against him for the grievance that he filed against NP Wilson and other health care staff after he allegedly told another nurse to take Nelson's ice away on June 5, 2018, and when RN Covert took away Nelson's crutches on June 12, 2018.

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action

---

[6]     RN Covert denies that he took away Nelson's ice detail on June 5, 2018, or that he directed another nurse to take away the ice detail on that date.  RN Covert states that his first interaction with Nelson occurred on June 12, 2018, when he saw him for a follow-up appointment.

was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.*

After a prisoner establishes the first two elements, the prisoner must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The Sixth Circuit has also employed a burden-shifting approach with respect to the causation element:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X,* 175 F.3d at 399.

Nelson says that he wrote and submitted a grievance on June 5, 2021.  RN Covert first argues that he had no knowledge of Nelson's grievance on June 5, 2018, the day the ice detail allegedly ended, or on June 12, 2018, the day that RN Covert ended the crutch detail.  (ECF No. 71, PageID.727.)  Covert asserts that Nelson's grievance was not received by the grievance coordinator until June 8, 2018, so there was no way he could have had knowledge of the grievance before the ice and crutch details were ended.  (*Id.*)  In the opinion of the undersigned, a genuine issue of fact

exists regarding the actual date that RN Covert learned about Nelson's grievance or intention to file a grievance.

In the opinion of the undersigned, the ending of the ice and crutch details were not adverse action because Nelson's sprain was not severe at the time each of these details had ended.  The medical records establish that Nelson no longer needed ice and crutches by June 12, 2018.  Nelson was able to walk by putting weight on his ankle on June 12, 2018.  The medical records show that these accommodations were no longer necessary, and that Nelson's ankle had healed without complication.

Finally, Nelson complains that although another nurse ended his ice detail, she did so at the direction of RN Covert.  It is unclear exactly when the ice detail ended.  Nelson says that on June 5, 2018, his ice detail ended, but that is the date that all medical details were extended by NP Wilson after she was first contacted regarding his fall from the bunk.  (ECF No. 68-5, PageID.708.)  On June 5, 2018, Nelson was examined by Nurse Payment, who noted "moderate swelling to medical aspect and dorsal surface of foot."  (ECF No. 71-1, PageID.750.)  RN Covert denies any involvement in ending the ice detail.  The medical records establish that there was no longer a need to ice Nelson's ankle or for the use of crutches by June 12, 2018.  Nelson fully recovered from his ankle sprain without any issues by June 19, 2018.  (ECF No. 68-2, PageID.635.)  Nelson's assertion that RN Covert ended these details due to the filing of a grievance is not supported by the record.

## VI.  Official Capacity Claim

To the extent that Nelson is suing RN Covert in his official capacity, such a claim is barred by the Eleventh Amendment.  The Supreme Court has held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

> A suit against a state official in his or her official capacity for damages cannot be maintained pursuant to § 1983 because that official has Eleventh Amendment immunity. This is true because "a suit against a state official in her or her official capacity is not a suit against the official but rather is a suit against the official's office." As such, a suit against a state official in his or her official capacity is no different than a suit against the state.

*Clark v. Chillicothe Corr. Inst.*, No. 2:19-CV-954, 2020 WL 1227224, at *3 (S.D. Ohio Mar. 13, 2020) (citations omitted).

The Sixth Circuit, in interpreting *Will*, has held "that plaintiffs seeking damages under § 1983 [must] set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply in their capacity as state officials. *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir. 1989).  To the extent that Nelson seeks money damages, costs, and fees from Defendant Covert in his official capacity, that part of his lawsuit is barred by sovereign immunity.[7]

---

[7]   "There are three exceptions to a State's sovereign immunity: (a) when the State has consented to suit; (b) when the exception first set forth in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), applies; and (c) when Congress has properly abrogated a State's immunity." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008).  Only the second exception is potentially at issue here. "Under the *Ex parte Young* exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Id.*  Nelson did not request injunctive relief in his complaint.  (ECF No. 1, PageID.15.)

## VII.  Qualified Immunity

As an alternative argument, RN Covert moves to dismiss Nelson's damages claims by asserting qualified immunity from liability.  "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir.2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?" *Id.* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006).

 "A right is 'clearly established' for qualified immunity purposes if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001)). The inquiry whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156; *see also Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S. Ct. 2012, 2023 (2014) (directing courts "not to define clearly established law at a high

level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced") (internal quotation marks and citations omitted). Thus, the doctrine of qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Humphrey*, 482 F.3d at 847 (internal quotation marks omitted).

"The relevant inquiry is whether existing precedent placed the conclusion" that the defendant violated the plaintiff's rights "in these circumstances 'beyond debate.'" *Mullenix v. Luna*, 36 S.Ct. 305, 309 (2015), citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  In the undersigned's opinion, RN Covert is entitled to the defense of qualified immunity from liability because the medical evidence, including Nelson's foot and ankle x-ray results, supports RN Covert's actions in treating Nelson on June 12, 2018.

## VIII.  Recommendation

It is respectfully recommended that the Court grant Defendant NP Wilson's motion for summary judgment (ECF No. 68) and Defendant RN Covert's motion for summary judgment (ECF No. 70).

If the Court accepts this recommendation, this case will be dismissed.


Dated:   December 30, 2021                            /s/ *Maarten Vermaat*
                                                      MAARTEN VERMAAT
                                                      U.S. MAGISTRATE JUDGE

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections

constitutes a waiver of any further right to appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).